Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Joshua D. Smith, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY COMPANY,

Docket No.:_______ (    )

Plaintiffs,

-against-

CSO SUPPLY CORP., REHAB ESSENTIALS CORP., RADION NIYAZOV, and JOHN DOE DEFENDANTS "1" through "10",

Defendants.
---------------------------------------------------------------------X

**COMPLAINT**

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against defendants, CSO Supply Corp., Rehab Essentials Corp., Radion Niyazov, and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1. GEICO brings this action to recover the monies that Defendants wrongfully obtained from GEICO, and to expunge the pending fraudulent "No-Fault" insurance billing submitted by Defendants, relating to medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME") in the form of purported iceless cold compression devices, continuous passive motion devices, infrared heating pad systems, cold therapy units, and other equipment ("Fraudulent Equipment") allegedly dispensed by CSO Supply Corp. ("CSO Supply") and Rehab Essentials Corp. ("Rehab Essentials") (collectively "DME Providers").

2. CSO Supply and Rehab Essentials (the "DME Providers") are owned and controlled by Radion Niyazov ("Niyazov" or the "Provider Owner"). Niyazov, along with John Doe Defendants "1" through "10", devised a scheme to exploit New York's No-Fault insurance system by using CSO Supply and Rehab Essentials to purportedly rent and sell the Fraudulent Equipment to New York automobile accident victims insured by GEICO ("Insureds"), without regard for patient care or whether there was any medical necessity for the Fraudulent Equipment.

3. Defendants targeted the prescription and dispensing of continuous passive motion devices ("CPMs"), iceless cold compression devices ("ICCDs"), cold therapy units ("CTUs"), and infrared heating pad systems as part of the fraudulent scheme because these devices have no specific billable code or have no set reimbursement amount, making them easier to exploit as part of an insurance fraud scheme as compared to other items of DME with specific billable codes and defined reimbursement amounts. Defendants, in fact, fraudulently manipulated the pricing of these items, to the extent they actually dispensed these items at all, and submitted bills to GEICO with

inflated charges for each item rented or sold to a patient, typically billing between $873.32 and $2,550.00 for each device per patient.

4. In furtherance of the scheme, Defendants colluded with the operators and managers (the "Clinic Controllers") of various medical clinics (the "Clinics") and various physicians and other healthcare providers (the "Prescribing Practitioners") that prescribed durable medical equipment to the Insureds treating at the Clinics, to steer prescriptions for the Fraudulent Equipment to the DME Providers, to the extent actual prescriptions were even issued. Defendants often billed for the Fraudulent Equipment intentionally utilizing preprinted prescription forms with expensive, preselected DME to claim entitlement to inflated fees to which they were never entitled, which prescriptions often contained unauthorized or illegally duplicated signatures of the Prescribing Practitioners. In some cases, Defendants billed GEICO for DME without any prescription whatsoever.

5. By this action, GEICO seeks to recover approximately $1,050,000.00 that has been wrongfully obtained by Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.9 million in pending no-fault insurance claims that have been submitted through the DME Providers, because:

(i) Defendants billed GEICO for the Fraudulent Equipment pursuant to a fraudulent scheme that included dispensing medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care;

(ii) Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals;

(iii) Defendants, in many cases, billed GEICO for the Fraudulent Equipment pursuant to unauthorized or illegally duplicated prescriptions or the complete absence of any prescription; and

(iv) to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by Defendants misrepresented the type and nature of DME provided to Insureds and fraudulently inflated the charges to GEICO.

6. Defendants fall into the following categories:

(i) CSO Supply and Rehab Essentials, i.e., the DME Providers, are New York corporations that purported to dispense the Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and billed New York automobile insurance companies, including GEICO;

(ii) Niyazov (or the "Provider Owner") is the individual who owns and controls the DME Providers, and who used the DME Providers as part of a fraudulent scheme to submit bills to GEICO and other New York automobile insurance companies for purportedly dispensing the Fraudulent Equipment to automobile accident victims; and

(iii) the John Doe Defendants are individuals who are presently not identifiable, but who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the DME Providers and the dispensing of the Fraudulent Equipment, engaging in illegal financial and kickback arrangements to obtain patient referrals for the DME Providers, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

7. As discussed below, Defendants at all times have known that the claims for Fraudulent Equipment submitted to GEICO by the DME Providers were fraudulent because: (i) the billing submitted to GEICO and other New York automobile insurers was pursuant to a fraudulent scheme that included dispensing medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care; (ii) the Fraudulent Equipment was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals; (iii) Defendants, in many cases, billed GEICO for the Fraudulent Equipment pursuant to unauthorized or illegally duplicated prescriptions; and (iv) to the extent that any Fraudulent Equipment was

provided to Insureds, the bills submitted by Defendants misrepresented the type and nature of DME provided to Insureds and fraudulently inflated the charges to GEICO.

8. As such, Defendants do not now have – and never had – any right to be compensated for their claims for the Fraudulent Equipment.

9. The charts attached hereto as Exhibits "1" and "2" set forth the fraudulent claims that have been identified to date that Defendants submitted, or caused to be submitted, to GEICO by Defendants under the names of CSO Supply and Rehab Essentials.

10. Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in 2020 and continues uninterrupted through the present day in that Defendants continue to attempt collection on the bills for the Fraudulent Equipment.

## THE PARTIES

### I. Plaintiffs

11. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal place of business in Bethesda, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II. Defendants

12. Defendant CSO Supply is a New York corporation with its principal place of business at 58-47 Francis Lewis Boulevard, Suite 14, Oakland Gardens, New York. CSO Supply was formed on January 5, 2016. Niyazov is the owner and sole member of CSO Supply. The Defendants used CSO Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13. Defendant Rehab Essentials is a New York corporation with its principal place of business at 58-47 Francis Lewis Boulevard, Suite 14, Oakland Gardens, New York. Rehab Essentials was formed on February 19, 2025. Niyazov is the owner and sole member of Rehab Essentials. The Defendants used Rehab Essentials as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14. Defendant Niyazov resides in and is a citizen of New York. Niyazov is not and has never been a licensed healthcare provider. Niyazov, at all relevant times, has been a primary driver of the fraudulent scheme, owned, operated, and controlled the DME Providers, associated with others not presently identifiable to obtain the illegitimate prescriptions from the Prescribing Practitioners and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

15. The John Doe Defendants are presently not identifiable, but (i) assisted with the operation of the DME Providers and the dispensing of the Fraudulent Equipment; (ii) are associated with the Clinics; (iii) are unlicensed individuals who unlawfully own and control the Clinics and the relationships with the Prescribing Practitioners; and (iv) have conspired with the DME Providers and Niyazov to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own economic benefit. Upon information and belief, the John Doe Defendants reside in and are citizens of New York but intentionally concealed their identities to obscure their participation in the fraudulent scheme.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

20. GEICO underwrites automobile insurance in New York.

## I. An Overview of the Pertinent Laws

### A. Pertinent Laws Governing No-Fault Insurance Reimbursement

21. New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

22. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23. In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME or orthotic devices ("OD"). See N.Y. Ins. Law § 5102(a).

24. In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

25. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

26. In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

27. In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law. In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

28. Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

29. Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B. Pertinent Statutes and Regulations Relating to No-Fault Benefits and DME**

30. Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

31. DME generally consists of items that can withstand repeated use and are primarily used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, cervical traction units, and devices to prevent deep vein thrombosis.

32. To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

33. In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds

by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

34. As it relates to DME, the New York Fee Schedule sets forth the maximum charges as follows:

> (a) The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>
> (2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

35. As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

36. According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

37. For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Centers for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS

Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

38. The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

39. Where a specific DME does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule Item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

40. For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

41. To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions set forth by Palmetto control to determine whether an item of DME qualifies for reimbursement under a specific HCPCS Code.

42. As it relates to charges for renting DME, the New York Fee Schedule sets forth the maximum charges as follows:

> the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

See 12 N.Y.C.R.R. § 442.2(b).

43. As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the lower of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

44. Additionally, DME suppliers are not entitled to separate charges for supplies and services provided in conjunction with the rental of DME.

45. Regardless of whether DME is provided for patients to keep or rented to patients, the maximum reimbursement rates set forth above include all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or setup of any DME.

46. Under the Medicaid Fee Schedule, the total monthly rental charges for equipment, supplies, and services, of Fee Schedule items is 10% of the maximum reimbursement amount.

47. For dates of service prior to April 4, 2022, when DME was rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount then the maximum charge for a monthly rental is 10% of the acquisition cost for the DME or OD, which includes all supplies that are provided with DME rental. See New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines, p. 16; Gov't Emples. Ins. Co. v. MII Supply LLC, Index No. 616953/18, Docket No.

43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals, including all supplies, within the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines to No-Fault reimbursement for HCPCS Codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

48. For these charges related to rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public because the New York State Department of Health has not established a price for DME rentals and defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

49. While rental items were subject to a maximum monthly rental cost, there was no "lifetime" cap for a DME item rented to an Insured.

50. In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

51. Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges, such as charges for the rental of certain continuous passive motion devices. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

52. Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

53. However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

54. Specifically, this emergency amendment capped the total rental of items to Insureds under HCPCS Code E1399 at the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

55. For dates of service on or after June 1, 2023, Part E of Appendix 17-C of 11 N.Y.C.R.R. 68 establishes calculations for the maximum permissible daily rental rates of Non-Fee Schedule items and the maximum total accumulated charges, as follows:

> (d)(1) On or after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth the acquisition cost to the provider. Rental charges for less than one month shall be calculated on a pro-rated basis using a 30-day month.
>
> (2) The total accumulated rental charge for such durable medical equipment shall be the least of the:
>
> (i) Acquisition cost plus 50%;
>
> (ii) Usual and customary price charged by durable medical equipment providers to the general public; or
>
> (iii) Purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

56. In essence, these new calculations establish a daily rental rate for Non-Fee Schedule items at 1/300th of the acquisition cost, and establish a maximum total rental reimbursement per patient that is not to exceed the lesser of 150% of the acquisition cost of the item, the usual and

customary price charged by other DME providers to the general public, or the purchase fee established in the Fee Schedule.

57. Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i) The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(ii) The prescription for DME is not based on any unlawful financial arrangement;

(iii) The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv) The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v) The fee sought for DME provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item; or

(vi) The *pro rata* monthly rental fee sought for renting DME to an Insured was not in excess of the standard for calculating rental reimbursement.

## II. <u>Defendants' Fraudulent Scheme</u>

### A. Overview of the Scheme

58. The Defendants devised and implemented an egregious fraudulent scheme in which they used the DME Providers to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated purchase and rental charges – which they were not eligible to receive – for the Fraudulent Equipment purportedly dispensed and rented to the Insureds.

59. The DME Providers did not market or advertise to the general public, lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who

might need DME or healthcare practitioners who might legitimately prescribe DME.

60. Similarly, Niyazov did virtually nothing that would be expected of the owner of legitimate DME supply companies to develop their reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

61. Instead, Niyazov entered into collusive financial arrangements with the John Doe Defendants, who were associated with both the Clinics and the Prescribing Practitioners, in order to steer large volumes of prescriptions, or purported prescriptions, from the Prescribing Practitioners to the DME Providers, purportedly on behalf of Insureds being treated at the Clinics.

62. These collusive financial arrangements involved, among other things, payments in excess of $100,000.00 made by the DME Providers to one more shell companies owned or controlled by Shlomo Mashiyev ("Mashiyev"), including an entity called 1997 Supplies Inc. Mashiyev was recently named as a defendant in a No-Fault insurance fraud lawsuit filed by another insurer in this District wherein it was alleged that he and others used another shell company to launder monies generated from a large-scale fraudulent No-Fault insurance billing scheme. See Allstate Ins. Co. v. Cypress Rx, Inc., No. 25-cv-04521-JAM, ECF No. 1 (E.D.N.Y. 2025).

63. In keeping with the fact that Niyazov entered into collusive financial arrangements to steer large volumes of prescriptions, or purported prescriptions, to the DME Providers, the DME Providers' home rentals and sales of the Fraudulent Equipment to Insureds were not medically necessary and were often dispensed using unauthorized and illegally duplicated prescriptions, all in furtherance of a fraudulent scheme to exploit the No-Fault insurance system.

64. Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare-related products, the DME Providers intentionally focused on items

without a specific billable code (e.g., ICCDs) and other Non-Fee Schedule Items without concrete reimbursement amounts (e.g., CPMs, CTUs, and infrared heating pad systems) because the charges for these items can be fraudulently manipulated and inflated.

65. The DME Providers, in fact, purported to dispense and bill for hundreds of items of medically unnecessary "miscellaneous" DME devices (including primarily ICCDs) using HCPCS Code E1399 -- which is the code reserved for medical equipment that does not have a set code -- typically charging GEICO between $2,000 and $3,750 for each single item of DME allegedly provided to an Insured. The use of HCPCS Code E1399 is typically reserved for unusual, out-of-the-ordinary "miscellaneous" items of DME not intended to be dispensed regularly to patients.

66. The Defendants' repeated dispensing of out-of-the-ordinary "miscellaneous" items of DME – which contain no specific billable code -- in protocol fashion is inconsistent with legitimate, medically based DME prescribing and dispensing practices.

67. In addition to dispensing hundreds of medically unnecessary miscellaneous items of DME, the Defendants also purported to dispense hundreds of medically unnecessary Non-Fee Schedule Items to Insureds, which have a reportable code but no set fee payable for the DME, at fraudulently inflated prices.

68. The Defendants chose these Non-Fee Schedule Items and the absence of a specific reimbursement amount because they could acquire these devices at low cost and submit false claims for reimbursement for the purported sale or rental of the devices to Insureds, typically resulting in charges to GEICO of more than $600.00 per single device and, in hundreds of instances, charges of $1,800.00 per device, per Insured.

69. The Fraudulent billing for Non-Fee Schedule Items was further exaggerated and inflated by repeated rental periods, accessory charges, and component billing that was not supported by patient-specific medical necessity.

70. Further, to the extent the DME Providers actually provided any DME to Insureds, the Fraudulent Equipment was prescribed and dispensed pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

71. In fact, the prescriptions obtained by the DME Providers that were generated at the Clinics were issued on preprinted prescription "forms" designed to facilitate the referral of the expensive devices in a predetermined fashion, using the exact same format, exact same print font, and exact same language.

72. The Defendants used the preprinted prescription forms to facilitate the prescription and referral of the Fraudulent Equipment and the steering of those prescriptions to CSO Supply and Rehab Essentials to submit in support of the fraudulent claims for reimbursement.

73. The Defendants spearheaded their fraud scheme involving the Prescribing Practitioners and the Clinic Controllers knowing that: (i) the Fraudulent Equipment, to the extent actually prescribed and dispensed, was medically unnecessary and done so pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; and (ii) the Defendants intentionally targeted specific items of DME (e.g., ICCDs, CPMs, CTUs, and infrared heating pad systems) that they acquired at low cost and dispensed in large volumes to Insureds at inflated prices.

B. **The Predetermined Fraudulent Protocols Associated with the Prescriptions**

74. The Defendants were able to obtain prescriptions, or purported prescriptions, that

could be used as a basis to submit billing to GEICO through predetermined fraudulent protocols that were established between and among the Defendants, John Doe Defendants, and the Prescribing Practitioners.

75. Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants and John Doe Defendants, not to genuinely treat the Insureds.

76. As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and treatment plans demonstrate a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that were not medically necessary to treat the Insureds' post-accident condition.

77. The vast majority, if not more, of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibits "1" and "2", were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds identified in Exhibits "1" and "2", whom the Prescribing Practitioners purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

78. In keeping with the fact that the vast majority of Insureds identified in Exhibits "1" and "2" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek medical treatment at any hospital as a result of their accidents.

79. To the extent the Insureds in the claims identified in Exhibits "1" and "2" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue

injury, such as a sprain or strain.

80. However, despite the vast majority of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar treatment and medically unnecessary protocols, including nearly identical prescriptions for Fraudulent Equipment.

81. The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits “1” and “2” were issued pursuant to predetermined fraudulent protocols set forth at each Clinic, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

82. For example, the predetermined fraudulent protocols at each Clinic: (i) included issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each patient’s individual symptoms or presentation; and (ii) were not based upon what was medically necessary for each patient. Instead, they were created based upon how the John Doe Defendants, and others including the Defendants, could profit from exploiting prescriptions purportedly issued by the Prescribing Practitioners.

83. In keeping with the fact that the prescriptions were based upon predetermined fraudulent protocols, not what was medically necessary for the Insureds, virtually all of the Insureds were prescribed DME after their low-speed and low-impact motor vehicle accidents when such DME is – in a legitimate clinical setting – only provided after appropriate consideration for a specific, documented, and correlated condition to patients. In other words, no legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols at the

various Clinics that were the Defendants' referral sources.

84. In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

85. Furthermore, in a legitimate setting, during a patient's treatment, a healthcare provider may – but generally does not – prescribe DME.

86. In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider is required to evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

87. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident. For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

88. In a legitimate setting, if a healthcare provider determines that DME is medically necessary, a valid DME prescription should be supported by contemporaneous documentation identifying the diagnosis, objective findings, body part, functional limitation, therapeutic purpose, duration, frequency/settings, less costly alternatives considered, and plan for reassessment.

89. Furthermore, the absence of follow-up documentation regarding the patients'

compliance, benefit, tolerance, or continued need for the prescribed DME is consistent with DME that is prescribed without regard for medical necessity.

90. Moreover, in a legitimate setting, when a patient returns for an examination after being prescribed DME, the healthcare provider will inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

91. It is improbable – to the point of an impossibility – that a large majority of the Insureds identified in Exhibits "1" and "2" who were treated at a specific Clinic would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

92. It is even more improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" and "2" who were treated by different Prescribing Practitioners at a specific Clinic legitimately would receive virtually identical prescriptions for numerous items of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

93. Notably, and adding to the improbability that the Insureds actually would need virtually identical prescriptions for numerous items of Fraudulent Equipment, is the fact that the Fraudulent Equipment purportedly prescribed are items designated as "miscellaneous" items containing no set HCPCS code, precisely because these items are *not* regularly prescribed and dispensed by prescribing practitioners such that no set code was even created for these items of DME.

94. Here, and in keeping with the fact that the prescriptions provided to the Defendants

were for medically unnecessary Fraudulent Equipment obtained as part of an insurance fraud scheme in which there were predetermined fraudulent protocols, numerous Insureds identified in Exhibits “1” and “2” that were treated at a specific Clinic were issued virtually identical prescriptions for a predetermined set of Fraudulent Equipment, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

95. To the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits “1” and “2”. For example:

(i) On March 22, 2021, Insured DS was involved in an automobile accident. Thereafter, DS sought treatment with Anastasia Platonova, N.P. (“NP Platonova”) and Citimed Complete Medical Care P.C. (“Citimed”) at a Clinic located at 2598 3rd Avenue, Bronx, New York. On November 12, 2021, Christopher Durant, M.D. (“Dr. Durant”) purported to perform arthroscopic shoulder surgery on the Insured. Dr. Durant did not indicate the prescription of any DME in his post-operative report. Nevertheless, on the same day of surgery, CSO Supply purported to dispense a CPM and CTU to the Insured based upon a prescription from Dr. Durant.

(ii) On February 4, 2020, Insured SN was involved in an automobile accident. Thereafter, SN sought treatment with Upendra Sinha, M.D. (“Dr. Sinha”) and Musculoskeletal and Arthritis Joint Replacement of Queens, P.C. (“MSJR P.C.”) at a Clinic located at 57-23 141st Street, Flushing, New York. On January 25, 2021, Dr. Sinha purported to perform arthroscopic knee surgery on the Insured. Dr. Sinha did not indicate the prescription of any DME in his post-operative report. Nevertheless, on February 13, 2021, CSO Supply purported to dispense a CPM and CTU to the Insured based upon a prescription from Dr. Sinha.

(iii) On October 13, 2022, Insured JD was involved in an automobile accident. Thereafter, JD sought treatment with Michael Russonella, M.D. (“Dr. Russonella”) and Integrated Pain and Rehabilitation Solutions, PLLC (“Integrated Pain”) at a Clinic located at 390 Fulton Avenue, Hempstead, New York. On January 13, 2023, Dr. Russonella purported to perform arthroscopic knee surgery on the Insured. Dr. Russonella did not indicate the prescription of any DME in his post-operative report. Nevertheless, on January 16, 2023, CSO Supply purported to dispense a CPM and ICCD to the Insured despite the

absence of any prescription for the items from Dr. Russonella or any other licensed practitioner.

(iv) On September 25, 2022, Insured YK was involved in an automobile accident. Thereafter, YK sought treatment with Dr. Russonella and Clinton Medical Office, P.C. ("Clinton Medical") at a Clinic located at 390 Fulton Avenue, Hempstead, New York. On December 2, 2022, Dr. Russonella purported to perform arthroscopic shoulder surgery on the Insured. Dr. Russonella did not indicate the prescription of any DME in his post-operative report. Nevertheless, on December 4, 2022, CSO Supply purported to dispense a CPM and ICCD to the Insured despite the absence of any prescription for the items from Dr. Russonella or any other licensed practitioner.

(v) On March 2, 2025, Insured AD was involved in an automobile accident. Thereafter, AD sought treatment with Joseph Gambino, D.C. ("Gambino") at a Clinic located at 37 Smith Street, Freeport, New York. Gambino did not indicate the prescription of any DME in his chiropractic exam or notes. Nevertheless, on December 3, 2025, Rehab Essentials purported to dispense an infrared heating pad to the Insured based upon a purported prescription from Gambino.

(vi) On March 2, 2025, Insured RS was involved in an automobile accident. Thereafter, RS sought treatment with Gambino at a Clinic located at 37 Smith Street, Freeport, New York. Gambino did not indicate the prescription of any DME in his chiropractic exam or notes. Nevertheless, on March 30, 2025, Rehab Essentials purported to dispense an infrared heating pad to the Insured based upon a purported prescription from Gambino.

(vii) On April 28, 2025, Insured NT was involved in an automobile accident. Thereafter, NT sought treatment with Wei Xu, N.P. ("Xu") at a Clinic located at 486 McDonald Avenue, Brooklyn, New York. Xu indicated the prescription of certain DME, but not an ICCD or infrared heating pad. Nevertheless, on June 23, 2025, Rehab Essentials purported to dispense an ICCD and infrared heating pad to the Insured based upon a purported prescription from Xu.

(viii) On March 5, 2025, Insured JD was involved in an automobile accident. Thereafter, JD sought treatment with Roland Rose, D.C. ("Rose") at a Clinic located at 108-25 Merrick Boulevard, Jamaica, New York. Rose did not indicate the prescription of any DME in his chiropractic exam or notes. Nevertheless, on March 20, 2025, Rehab Essentials purported to dispense an infrared heating pad to the Insured based upon a purported prescription from Rose.

(ix) On April 2, 2025, Insured JL was involved in an automobile accident. Thereafter, JL sought treatment with Rose at a Clinic located at 108-25 Merrick Boulevard, Jamaica, New York. Rose did not indicate the prescription of any

DME in his chiropractic exam or notes. Nevertheless, on May 2, 2025, Rehab Essentials purported to dispense an ICCD and infrared heating pad to the Insured based upon a purported prescription from Rose.

(x) On April 13, 2025, Insured OS was involved in an automobile accident. Thereafter, OS sought treatment with Rose at a Clinic located at 108-25 Merrick Boulevard, Jamaica, New York. Rose did not indicate the prescription of any DME in his chiropractic exam or notes. Nevertheless, on May 22, 2025, Rehab Essentials purported to dispense an ICCD and infrared heating pad to the Insured based upon a purported prescription from Rose.

96. These are only representative examples. The Defendants routinely submitted bills to GEICO for Fraudulent Equipment dispensed to Insureds identified in Exhibits "1" and "2" where the Prescribing Practitioner failed to specifically identify the DME prescribed and, in many cases, failed to indicate altogether that DME was being prescribed. Additionally, in many cases, the Defendants submitted bills to GEICO for Fraudulent Equipment dispensed to Insureds identified in Exhibits "1" and "2" despite the absence of any prescription whatsoever.

97. In addition to failing to identify the specific DME prescribed or that DME was being prescribed altogether, the Defendants routinely submitted billing where the Prescribing Practitioner failed to document why ordinary conservative treatment was insufficient and failed to document the device's expected use, duration, or intended benefits.

98. In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" and "2" were not medically necessary but were the result of predetermined fraudulent protocols, the prescriptions often did not identify specific DME, to the extent any prescriptions were even issued. Instead, the prescriptions typically contained vague and generic descriptions which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME they decided to dispense.

99. For the reasons set forth above, and below, in each of the claims identified in

Exhibits "1" and "2", the Defendants falsely represented that the Fraudulent Equipment was provided pursuant to legitimate prescriptions from healthcare providers for medically necessary DME, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants' insurance fraud scheme.

### 1. Collusive Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions for Medically Unnecessary DME

100. To gain access to Insureds so that the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into collusive referral agreements with the John Doe Defendants in order to steer prescriptions to the DME Providers that were illegitimate and for medically unnecessary Fraudulent Equipment.

101. Since at least 2020, the Defendants engaged in various collusive referral arrangements, facilitated through at least one shell company, pursuant to which Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Prescribing Practitioners for the Fraudulent Equipment that could then be used to support the Fraudulent Equipment dispensed by the DME Providers. The collusive nature of the arrangement goes beyond the simple payment of money or other financial incentives, but includes: (i) the ability to secure the prescriptions without ever meeting the Prescribing Practitioners; (ii) obtaining the prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds; and (iii) providing the Fraudulent Equipment to the Clinic and its staff, without any interaction with the Insureds, and without any interaction with the Defendants.

102. The collusive arrangements allowed the scheme to remain undetected by the Insureds and allowed the Defendants to access large volumes of prescriptions that in turn afforded

them the opportunity to submit charges for thousands of dollars in Fraudulent Equipment for each Insured to GEICO and other automobile insurers. But for the collusive arrangements, neither the John Doe Defendants nor the Prescribing Practitioners would have had any reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to the DME Providers to purportedly fill.

103. Upon information and belief, the Prescribing Practitioners were compensated by the John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insured and independently bill GEICO), for the Prescribing Practitioners' willingness to permit prescriptions to be issued in their names and to be given to providers of DME, including the DME Providers, rather than given to the Insureds or to a bona-fide DME/OD retailer that would likely question its legitimacy.

104. The collusive relationship between the Defendants, John Doe Defendants, and Prescribing Practitioners in relation to the prescriptions are the very kind of arrangement that is prohibited by N.Y. Public Health Law § 238-d, without a specific disclosure to the patient of the financial relationship between the Prescribing Practitioner and the DME Provider. In actuality, no such disclosure required by Public Health Law § 238-d was ever disclosed to the Insureds identified in Exhibits "1" and "2". Rather, because of the nefarious nature of the relationship between the Defendants and the John Doe Defendants, the arrangements between and among the Defendants, John Doe Defendants, and Prescribing Practitioners were concealed from the Insureds.

105. As a result of these collusive relationships, the Defendants (rather than the Insured or a bona-fide DME retailer) were given the illegitimate prescriptions, which (i) were for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need; (ii)

contained a photocopied or illegally duplicated signature of the Prescribing Practitioner; (iii) were pre-signed/boilerplate with the patient names changed; and/or (v) were not signed by the listed healthcare provider.

106. The Defendants were able to obtain these illegitimate prescriptions for Fraudulent Equipment due to their collusive arrangements with the John Doe Defendants at each of the Clinics, which gave them access to the illegitimate prescriptions.

107. In contrast to a bona fide DME retailer, the Defendants were willing to obtain illegitimate prescriptions through collusive arrangements and submit the illegitimate prescriptions to support their charges to GEICO and other automobile insurers.

108. The Clinics that steered prescriptions for the Fraudulent Equipment to the DME Providers include, among others, the following locations:

(i) 2598 3rd Avenue, Bronx, New York;
(ii) 57-23 141st Street, Flushing, New York;
(iii) 390 Fulton Avenue, Hempstead, New York;
(iv) 2118 Coney Island Avenue, 3rd Floor, Brooklyn, New York; and
(v) 108-25 Merrick Boulevard, Jamaica, New York

109. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics from where the Defendants generated the prescription and referrals for the Fraudulent Equipment were, in many cases, organized to supply "one-stop" shops for No-Fault insurance fraud.

110. For example, a physician who worked in the past at the Clinic located at 108-25 Merrick Boulevard, Jamaica, New York stated under oath that, among other things: (i) he began prescribing certain medications to patients at that Clinic after he was advised by the "manager" of the Clinic that a pharmacy would steer patients to the Clinic if he prescribed the medications; (ii) he nevertheless learned that his name, license and signature were forged on preprinted prescription

forms; and (iii) he never authorized anyone at the Clinic to sign his name or use a stamp with his signature to sign or authorize prescriptions.

111. Further, upon information and belief, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons and are nothing more than multidisciplinary medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

### C. The Fraudulent Equipment was Prescribed Pursuant to Fraudulent Protocols and Dispensed by CSO Supply and Rehab Essentials

112. Through the Defendants' participation in collusive arrangements with the John Doe Defendants, the Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent Equipment purportedly issued from various medical practices operating at the various Clinics, pursuant to predetermined fraudulent protocols.

#### 1. The Fraudulent Billing for Iceless Cold Compression Devices

113. As part of their fraudulent scheme, the Prescribing Practitioners prescribed, and the DME Defendants dispensed and billed for ICCDs and attendant accessories resulting in charges of between $1,050.00 and $2,550.00 per Insured who purportedly received the device, even though at best, the DME Providers dispensed cheap, cold compression devices to the extent any device was dispensed at all.

114. Virtually all of the charges for ICCDs the DME Defendants submitted, or caused to be submitted, were pursuant to preprinted ICCD prescription forms. These prescription forms were distributed to the Prescribing Practitioners to sign and were then photocopied as part of the Defendants' scheme to bill GEICO for medically unnecessary Fraudulent Equipment.

115. The ICCDs dispensed by the DME Defendants essentially provide cold therapy to a part of the patient's body and are no more effective than using a standard icepack and bandage.

116. Where a patient can place an icepack, there is no medically necessary reason to use an ICCD. This is particularly true considering that medical studies have shown no difference in recovery or functionality for patients using an ICCD compared to an icepack.

117. Given the equivalent utility of traditional icepacks, the prescription of significantly higher cost ICCDs is rarely, if ever, medically justified, absent a documented inability to effectively utilize an icepack.

118. Moreover, the use of cold therapy – either in the form of an icepack or an ICCD – subsequent to trauma to decrease swelling, is generally most effective during the first few days after acute injury.

119. The sale or rental of a high-cost ICCD for normal pain or swelling resulting from a traumatic injury generally treated successfully with traditional icepacks requires a documented medical need.

120. It is improbable that a legitimate physician would issue a prescription for an ICCD to a patient more than one week post-motor vehicle accident.

121. It is also improbable that a legitimate physician would issue a prescription for an ICCD to a patient post-motor vehicle accident when that patient is able to use icepacks.

122. In keeping with the fact that the Fraudulent Equipment prescribed by the Prescribing Practitioners to the Insureds identified in Exhibit "1" was medically unnecessary and provided pursuant to a predetermined fraudulent protocol, in the significant majority of instances the Insureds identified in Exhibit "1" and "2" were prescribed the ICCD more than a week after the accident, and long after the period when cold therapy and compression – or even an icepack and ACE bandage – would decrease swelling after the trauma from an automobile accident.

123. For these reasons, in each of the claims identified in Exhibits "1" and "2", the DME

Providers falsely represented that ICCDs were medically necessary, and were, therefore, eligible to collect No-Fault Benefits, when, in fact, the prescriptions were for medically unnecessary ICCDs issued by the Prescribing Practitioners pursuant to predetermined fraudulent protocols and provided to the DME Defendants pursuant to the Defendants' fraudulent scheme.

124. As noted above, in a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints would be evaluated, and the treating provider would direct a specific course of treatment based upon the patient's individual symptoms or presentation and assess whether that course of treatment was working before prescribing a DME device, like an ICCD, that has not been proven sufficiently effective.

125. There also are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

126. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

127. It is extremely improbable that multiple Insureds of different ages, sexes, and physical conditions, and who were located in different areas within a vehicle, who were involved in the same automobile accident would routinely need prescriptions for DME of substantially the same type and, where rental equipment is involved, for the same period of time, if those Insureds were being provided with legitimate, individualized and genuine patient care.

128. Nevertheless, in keeping with the fact that the prescriptions for the Fraudulent Equipment identified in Exhibits "1" and "2" were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, multiple Insureds involved in the same

accident were each prescribed the same ICCD, typically at or about the same time, which was not warranted by their purported injuries, to the extent they were even injured at all. For example:

(i) On September 25, 2022, two insureds – YK and JIH – were involved in the same automobile accident. Thereafter, on December 4, 2022 and January 17, 2023, respectively, YK and JIH were both purportedly dispensed ICCDs by Rehab Essentials. Rehab Essentials billed GEICO a total of $2,100.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(ii) On March 22, 2025, two insureds – MB and AB – were involved in the same automobile accident. Thereafter, on May 2, 2025, MB and AB were both purportedly dispensed ICCDs by Rehab Essentials. Rehab Essentials billed GEICO a total of $2,550.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(iii) On April 17, 2025, three insureds – DU, GI, and GT – were involved in the same automobile accident. Thereafter, between April 27, 2025, and May 9, 2025, DU, GI, and GT were all purportedly dispensed ICCDs by Rehab Essentials. Rehab Essentials billed GEICO a total of $2,550.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(iv) On May 14, 2025, two insureds – SM and GG – were involved in the same automobile accident. Thereafter, on June 20, 2025, SM and GG were both purportedly dispensed ICCDs by Rehab Essentials. Rehab Essentials billed GEICO a total of $2,550.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(v) On May 9, 2025, two insureds – LS and MS – were involved in the same automobile accident. Thereafter, on May 30, 2025, LS and MS were both purportedly dispensed ICCDs by Rehab Essentials. Rehab Essentials billed GEICO a total of $2,550.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(vi) On April 28, 2025, two insureds – PM and NT – were involved in the same automobile accident. Thereafter, on June 23, 2025, PM and NT were both purportedly dispensed ICCDs by Rehab Essentials. Rehab Essentials billed GEICO a total of $2,550.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

(vii) On December 13, 2024, two insureds – AP and PBP – were involved in the same automobile accident. Thereafter, on March 19, 2025, AP and PBP were both purportedly dispensed ICCDs by Rehab Essentials. Rehab Essentials billed

> GEICO a total of $2,550.00 for each of these Insureds pursuant to the predetermined fraudulent protocol established by the Defendants.

129. These are only representative examples. Multiple Insureds involved in the same accident were routinely prescribed the same ICCD, typically at or about the same time, which was not warranted by their purported injuries, to the extent they were even injured at all.

130. The prescribing and dispensing of the ICCDs to multiple Insureds involved in the same accident was not only unwarranted by the Insureds' purported injuries, to the extent they were even injured at all, but made no medical sense given the lack of proven effectiveness of the ICCDs, the high charges for the rental and sale of the units, and the lack of any generally accepted treatment guidelines supporting the use of the devices.

131. In keeping with the fact that the prescriptions for the Fraudulent Equipment provided to Insureds were not medically necessary and provided, to the extent provided at all, pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports written by healthcare providers often never made any reference to ICCDs being prescribed, nor was there any information in the contemporaneous examination reports to explain why the healthcare provider was prescribing the Fraudulent Equipment.

132. Furthermore, and in keeping with the fact that the prescriptions for the ICCDs were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that Insureds returned for a follow-up examination, the follow-up examination reports rarely, if ever, referenced or discussed the Insureds' previously prescribed ICCDs.

133. In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment

regarding the previously prescribed DME or adjust the patient's treatment as necessary.

134. However, the follow-up examination reports from healthcare providers virtually always failed to include any information regarding Fraudulent Equipment prescribed to the Insureds on a prior date.

135. In every claim identified in Exhibits "1" and "2", the Fraudulent Equipment was prescribed pursuant to predetermined protocols designed to maximize profits and not based upon medical necessity.

### 2. The Fraudulent Billing for Continuous Passive Motion Devices

136. Pursuant to the Defendants' predetermined fraudulent protocols and collusive arrangements, the Defendants purportedly routinely dispensed rental CPMs to the Insureds in Exhibit "1," typically after minimally-invasive arthroscopic surgeries.

137. In a legitimate setting, there are only a limited number of circumstances where CPMs are medically necessary to aid in a patient's recovery. A CPM is a machine that provides joint movement without active contraction of muscle groups, with the goal of increasing range of motion and promoting healing of joint surfaces. CPMs may be considered in certain post-operative circumstances, such as total knee arthroplasty, ACL reconstruction, cartilage restoration, arthrofibrosis release, or other serious procedures. Circumstances where CPMs could be medically necessary include patient recovery after total replacement of a patient's knee or shoulder, or surgery to repair an anterior cruciate ligament.

138. CPM is generally not medically necessary after minimally invasive arthroscopic procedures where the patient is ambulatory and able to participate in physical therapy. Specifically, in such instances: (i) physical therapy provides long-term benefits that CPMs cannot; and (ii)

medical studies have concluded that the use of CPMs in post-operative recovery does not provide short-term or long-term benefits.

139. In support of the fact that the CPMs are not medically necessary after arthroscopic surgeries, an evidence-based study on rehabilitation after arthroscopic rotator cuff repair revealed that there is no significant difference in the outcome of patients who used CPMs for three to four weeks after surgery compared to those who did not use CPMs for the same period.

140. In further support of the limited uses of CPMs, the Centers for Medicare and Medicaid Services issued a National Coverage Determination concluding that CPMs are only considered necessary after: (i) total knee arthroplasty; (ii) anterior cruciate ligament repair/reconstruction; (iii) during the non-weight-bearing period to promote healing after cartilage grafting procedures; and (iv) surgical release of arthrofibrosis of any joint.

141. Consistent with limited uses of CPMs by the Centers for Medicare and Medicaid, the American Academy of Orthopedic Surgeons ("AAOS") issued clinical practice guidance that the use of CPMs in *total knee replacement surgery* does not improve outcomes. Even more, AAOS clinical practice guidelines for rotator cuff and anterior cruciate ligament repairs do *not even address* the use of CPMs as part of the rehabilitative process.

142. Unlike the Insureds identified in Exhibit "1" who were issued prescriptions for CPMs after a minimally invasive arthroscopic procedure, patients who undergo serious knee or shoulder surgery may have some short-term benefits by using CPMs to aid in quicker range-of-motion recovery.

143. To the extent that CPMs are medically appropriate, in a legitimate setting, CPMs will be prescribed for only a short-term period that is typically less than two weeks. Long-term

usage of CPMs – such as for up to four weeks – will not legitimately be prescribed as there is no evidence that the long-term use of CPMs provides any benefit to patients.

144. Additionally, in a legitimate setting, a patient would need a specific medical co-morbidity necessitating the need for a CPM, and the co-morbidity would be documented pre-operatively to indicate the necessity of a CPM.

145. It is improbable that a legitimate healthcare provider would issue a prescription for a CPM to a patient post-arthroscopic surgery – let alone for up to four weeks of use – when that patient is ambulatory, is able to undergo traditional physical therapy, and does not have a notated co-morbidity necessitating the need for a CPM.

146. In keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" after surgery were medically unnecessary and were provided pursuant to predetermined fraudulent protocols, the Insureds identified in Exhibit "1" were typically issued CPMs by the Defendants for up to four weeks at a time after arthroscopic surgeries when the Insureds were able to and did undergo a physical therapy program that was contemporaneously prescribed.

147. Furthermore, and in keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" were medically unnecessary and were provided pursuant to predetermined fraudulent protocols, the contemporaneously dated medical records, such as the surgical records, routinely failed to identify and never explained the medical necessity of the prescriptions for CPMs that were used by the Defendants to submit charges to GEICO.

148. For a legitimate and valid prescription, every prescription must have, among other things, an explanation for how the patient is supposed to use the prescribed DME. Here, the

prescriptions submitted by the Defendants routinely failed to explain how the Insured is supposed to use the CPM device, making the prescription incomplete and, therefore, invalid.

149. Even if the CPMs that were prescribed to the Insureds identified in Exhibit "1" were medically appropriate, the four-week rental periods for the CPMs prescribed to the Insureds by the Referring Providers exceeded medical utility and did not comport with generally accepted medical guidelines, including the AAOS guidelines, which do not recommend them in the context prescribed to the Insureds identified in Exhibit "1".

150. For the reasons set forth above, all of the charges for CPMs identified in Exhibit "1" were not medically necessary and were provided as part of the Defendants' predetermined fraudulent protocols and collusive arrangements.

**3. The Fraudulent Billing for CTUs**

151. Similarly, the CTUs that were prescribed and issued to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to the Defendants' predetermined fraudulent protocols and collusive arrangements because they did not provide any additional medical benefit to Insureds.

152. CTUs are effectively an ice pack combined with compression to provide cold therapy to a part of a person's body. In fact, there is no evidence to support that the use of a CTU provides any different result than using an ice pack.

153. When a patient suffers from sprains and strains as part of a minor automobile accident, the patient's sprains and strains will virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, which includes using ice packs and placing an elastic bandage to provide compression.

154. Where a patient is in a position to be able to place an ice pack and is able to use an elastic bandage for compression, there is no medically necessary reason to use a CTU. This is especially true considering that medical studies have shown no difference in recovery or functionality of patients using a CTU compared to an ice pack.

155. In keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, there was routinely no indication in contemporaneously dated medical records to explain why the Insureds could not use an ice pack or a compression bandage to treat the Insureds' sprains and strains and why a CTU was medically necessary.

156. Moreover, the use of cold therapy – either in the form of an ice pack or a CTU – for post-operative patients to decrease swelling, including patients who undergo minimally invasive procedures such as arthroscopic surgery, is most effective during the first 48 hours after surgery.

157. It is improbable that a legitimate healthcare provider would issue a prescription for a CTU to a patient post-arthroscopic surgery – let alone for multiple weeks of use – when that patient is able to use ice packs.

158. In keeping with the fact that the CTUs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" were virtually always prescribed CTUs by the Referring Providers for weeks at a time when there was no objective evidence that the Insureds were unable to use an ice pack.

159. For the reasons set forth above, all of the charges for CTUs identified in Exhibit "1" were not medically necessary and were provided as part of the Defendants' predetermined fraudulent protocols and collusive arrangements.

### 4. The Fraudulent Billing for Infrared Heating Pad Systems

160. As part of the fraudulent scheme, CSO Supply and Rehab Essentials routinely received prescriptions from the Clinics that purported to prescribe the use of infrared heating pad systems, and the Defendants routinely dispensed infrared heating pad systems to Insureds identified in Exhibits "1" and "2".

161. For each infrared heating pad system purportedly dispensed to an Insured identified in Exhibits "1" or "2", the Defendants submitted billing to GEICO under HCPCS Code E0221 in the amount of $1,800.00 per system.

162. The devices dispensed to Insureds identified in Exhibits "1" and "2" were, in actuality, cheap, commercially available devices, available for sale to the public for $75.00 or less, including by the same wholesaler from which Rehab Essentials purported to purchase the devices.

163. As discussed in further detail below, the Defendants utilized fabricated wholesale invoices to indicate that the DME Providers paid $1,200.00 per infrared heating pad system dispensed to Insureds in order to fraudulently inflate the amount they could bill to GEICO and other insurers.

164. These fabricated wholesale invoices disguised the fact that Defendants paid a mere fraction of the purported wholesale invoice, solely to inflate the fraudulent billing submitted to GEICO and other insurers.

165. An infrared heating pad system consists of a pad or pads containing mechanisms that generate infrared (or near infrared) light and a power source. Infrared therapy devices are used to treat an area of the skin and adjacent subcutaneous tissues of a patient with infrared energy, using an array of juxtaposed infrared diodes affixed to a flexible pad to retain skin contact.

166. By submitting bills to GEICO seeking No-Fault Benefits for the Fraudulent Equipment, seeking reimbursement under HCPCS Code E0221, CSO Supply and Rehab Essentials represented that they provided Insureds with an infrared heating pad system that was medically necessary, as determined by a healthcare provider licensed to prescribe DME.

167. In keeping with the lack of medical necessity for the infrared heating pad systems purportedly dispensed by DME Providers, CMS published a National Coverage Determination ("NCD") in which it concluded that "the use of infrared therapy and any related accessories is not reasonable and necessary . . . ." CMS further issued a Local Coverage Determination ("LCD") reiterating that "there are no indications for which these devices have been demonstrated to have any therapeutic effect."

**D. The Inflated Charges for the Purported Rental and Sale of ICCDs, CPMs, and Infrared Heating Pad Systems**

168. In addition to the Defendants' submission of bills based upon collusive referral and financial arrangements, unauthorized or illegally duplicated signatures, and medically unnecessary prescriptions pursuant to predetermined fraudulent protocols, the Defendants submitted bills to GEICO that misrepresented, to the extent that any Fraudulent Equipment was provided, that the charges for Fraudulent Equipment were for permissible reimbursement rates, when they were not.

169. When the Defendants submitted bills to GEICO seeking payment for the Fraudulent Equipment, each of the charges identified HCPCS codes that were used to describe the items purportedly rented or provided to the Insureds.

170. When the Defendants submitted bills to GEICO seeking payment for selling Non-Fee Schedule items, which included ICCDs and infrared heating pad systems, the Defendants fraudulently misrepresented that the charges were no greater than the maximum permissible reimbursement amount of the lesser of 150% of the Defendants' legitimate acquisition cost or the

usual and customary price charged to the general public.

171. For example, and as set forth in Exhibits "1" and "2", when the Defendants submitted bills to GEICO using HCPCS Code E0221 for purportedly providing infrared heating pad systems to Insureds – to the extent that the DME was actually provided to Insureds – the Defendants fraudulently misrepresented that they were able to collect $1,800.00, purportedly representing 150% of their legitimate acquisition cost.

172. The Defendants' actual acquisition cost for each infrared heating pad system was only a fraction of the purported acquisition cost used by Defendants to calculate their charges; accordingly, the maximum reimbursement rate was only a fraction of what was charged by the Defendants to GEICO.

173. For example, Niyazov and Rehab Essentials purported to pay a New Jersey wholesaler named Ram Basics Inc. ("Ram Basics") $1,200.00 per device to acquire numerous infrared heating pad systems that were ultimately dispensed to GEICO Insureds and then billed to GEICO at $1,800.00 per device.

174. In support of these charges, Niyazov and Rehab Essentials submitted fraudulent invoices to GEICO falsely representing that Defendants paid Ram Basics $1,200.00 per infrared heating pad system.

175. Ram Basics, however, sells the exact same infrared heating pad system to the general public under its "Dr. Franklyn's" brand of devices, for $75.00 per device.

176. In actuality, Niyazov and Rehab Essentials paid Ram Basics no more than $75.00 per device and utilized fraudulent wholesale invoices to create the illusion that these were something other than cheap, commercially available devices and thus warranted the $1,800.00 per device charge submitted to GEICO and other insurers.

177. In all of the charges submitted to GEICO for the sale of ICCDs, CPMs, CTUs, and infrared heating pad systems, the Defendants fraudulently misrepresented their acquisition cost and unlawfully inflated the charges submitted to GEICO.

## II. **The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

178. To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

179. The NF-3 forms, HCFA-1500 forms, and treatment reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i) The NF-3 forms, HCFA-1500 forms, and treatment reports that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects: The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols;

(ii) The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment (a) based

on prescriptions secured through collusive arrangements with the John Doe Defendants, and (b) based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures;

(iii) The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any Fraudulent Equipment, it was based on decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items; and

(iv) The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the Defendants billed properly and dispensed Fraudulent Equipment on a rental basis. In fact, the bills for the Fraudulent Equipment submitted to GEICO by the Defendants fraudulently inflated the rental charges as the maximum daily rental rate for the SAM Units is substantially less than the amounts per day charged to GEICO.

## III. Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

180. Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to GEICO.

181. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Equipment, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

182. Specifically, the Defendants knowingly misrepresented and concealed facts related to the DME Provider in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

183. Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

184. Additionally, the Defendants knowingly misrepresented and concealed facts in

order to prevent GEICO from discovering that the Fraudulent Equipment was medically unnecessary and provided – to the extent it was provided at all – pursuant to fraudulent predetermined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Equipment.

185. The Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers, in order to monetize the fraudulent scheme. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

186. The Defendants' collection efforts through numerous separate no-fault collection proceedings are an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

187. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. GEICO takes steps to timely respond to all claims and to ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner.

188. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of approximately $1,050,000.00 based upon the fraudulent charges for the Fraudulent Equipment.

189. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

190. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

191. There is an actual case in controversy regarding more than $1.9 million in fraudulent pending billing that has been submitted to GEICO in the names of CSO Supply and Rehab Essentials.

192. The Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted as part of a fraudulent scheme that included dispensing medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care.

193. The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Equipment was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals.

194. The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Equipment was dispensed pursuant to unauthorized or illegally duplicated prescriptions.

195. The Defendants have no right to receive payment for any pending bills submitted to GEICO because, to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants misrepresented the type and nature of DME provided to Insureds and fraudulently inflated the charges to GEICO.

196. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of CSO Supply.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against CSO Supply, Niyazov, and John Doe Defendants**
**(Common Law Fraud)**

197. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

198. CSO Supply and Niyazov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

199. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary when, in fact, Defendants dispensed medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care; (ii) in every claim, that the Fraudulent Equipment was dispensed pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals; (iii) in many claims, the

representation that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to unauthorized or illegally duplicated prescriptions; and (iv) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when, in fact the bills submitted by the Defendants misrepresented the type and nature of DME provided to insureds and fraudulently inflated the charges to GEICO.

200. CSO Supply and Niyazov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through CSO Supply that were not compensable under the No-Fault Laws.

201. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $453,000.00 pursuant to the fraudulent bills submitted by Defendants. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that CSO Supply submitted, or caused to be submitted, to GEICO.

202. CSO Supply and Niyazov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

203. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
**Against CSO Supply, Niyazov, and John Doe Defendants**
**(Unjust Enrichment)**

204. GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

205. As set forth above, CSO Supply and Niyazov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

206. When GEICO paid the bills and charges submitted by or on behalf of CSO Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

207. The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

208. The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

209. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $453,000.00.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Niyazov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

210. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

211. CSO Supply is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

212. Niyazov knowingly conducted and/or participated, directly or indirectly, in the conduct of CSO Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges that CSO Supply was not eligible

to receive under the New York No-Fault Laws because: (i) Defendants billed GEICO for the Fraudulent Equipment pursuant to a fraudulent scheme that included dispensing medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care; (ii) Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals; (iii) Defendants, in many cases, billed GEICO for the Fraudulent Equipment pursuant to unauthorized or illegally duplicated prescriptions; and (iv) to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants misrepresented the type and nature of DME provided to insureds and fraudulently inflated the charges to GEICO. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

213. CSO Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Niyazov operated CSO Supply, insofar as CSO Supply is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for CSO Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Niyazov continues to attempt collection on the fraudulent billing submitted by CSO Supply to the present day.

214. CSO Supply is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently

unlawful acts are taken by CSO Supply in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

215. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $453,000.00 pursuant to the fraudulent bills submitted through CSO Supply.

216. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Against Niyazov and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

217. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

218. CSO Supply is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

219. Niyazov and the John Doe Defendants are owners of, employed by, or associated with the CSO Supply enterprise.

220. Niyazov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of CSO Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since its inception seeking payments that CSO Supply was not eligible to receive under the New York No-Fault Laws because: (i) Defendants billed GEICO for the Fraudulent Equipment pursuant to a fraudulent scheme that included dispensing medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined

fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care; (ii) Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals; (iii) Defendants, in many cases, billed GEICO for the Fraudulent Equipment pursuant to unauthorized or illegally duplicated prescriptions; and (iv) to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants misrepresented the type and nature of DME provided to insureds and fraudulently inflated the charges to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

221. Niyazov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

222. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $453,000.00 pursuant to the fraudulent bills submitted through CSO Supply.

223. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION
**Against Rehab Essentials, Niyazov, and John Doe Defendants**
**(Common Law Fraud)**

224. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

225. Rehab Essentials and Niyazov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

226. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary when, in fact, Defendants dispensed medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care; (ii) in every claim, that the Fraudulent Equipment was dispensed pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals; (iii) in many claims, the representation that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to unauthorized or illegally duplicated prescriptions; and (iv) in every claim, the representation that the billed-for services were properly billed in accordance with the Fee Schedule, when, in fact the bills submitted by the Defendants misrepresented the type and nature of DME provided to insureds and fraudulently inflated the charges to GEICO.

227. Rehab Essentials and Niyazov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Rehab Essentials that were not compensable under the No-Fault Laws.

228. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $596,000.00 pursuant to the fraudulent bills submitted by Defendants. The chart annexed hereto as Exhibit "2" sets forth a representative sample of the fraudulent claims that have been identified to-date that Rehab Essentials submitted, or caused to be submitted, to GEICO.

229. Rehab Essentials and Niyazov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

230. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
**Against Rehab Essentials, Niyazov, and John Doe Defendants**
**(Unjust Enrichment)**

231. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

232. As set forth above, Rehab Essentials and Niyazov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

233. When GEICO paid the bills and charges submitted by or on behalf of Rehab Essentials for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

234. The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

235. The Defendants' retention of GEICO's payments violates fundamental principles

of justice, equity and good conscience.

236. By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $596,000.00.

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**Against Niyazov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

237. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

238. Rehab Essentials is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

239. Niyazov knowingly conducted and/or participated, directly or indirectly, in the conduct of Rehab Essentials' affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges that Rehab Essentials was not eligible to receive under the New York No-Fault Laws because: (i) Defendants billed GEICO for the Fraudulent Equipment pursuant to a fraudulent scheme that included dispensing medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care; (ii) Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals; (iii) Defendants, in many cases, billed GEICO for the Fraudulent Equipment pursuant to unauthorized or illegally duplicated prescriptions; and (iv) to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants misrepresented the type and nature of DME provided to insureds

and fraudulently inflated the charges to GEICO. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

240. Rehab Essentials' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Niyazov operated Rehab Essentials, insofar as Rehab Essentials is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Rehab Essentials to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Niyazov continues to attempt collection on the fraudulent billing submitted by Rehab Essentials to the present day.

241. Rehab Essentials is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Rehab Essentials in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

242. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $596,000.00 pursuant to the fraudulent bills submitted through Rehab Essentials.

243. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Against Niyazov and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

244. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

245. Rehab Essentials is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

246. Niyazov and the John Doe Defendants are owners of, employed by, or associated with the Rehab Essentials enterprise.

247. Niyazov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Rehab Essentials' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges since its inception seeking payments that Rehab Essentials was not eligible to receive under the New York No-Fault Laws because: (i) Defendants billed GEICO for the Fraudulent Equipment pursuant to a fraudulent scheme that included dispensing medically unnecessary Fraudulent Equipment that was prescribed and dispensed pursuant to predetermined fraudulent protocols and collusive arrangements designed to exploit patients for financial gain without regard for genuine patient care; (ii) Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent that any was provided – pursuant to decisions made by unlicensed laypersons rather than duly licensed healthcare professionals; (iii) Defendants, in many cases, billed GEICO for the Fraudulent Equipment pursuant to unauthorized or illegally duplicated prescriptions; and (iv) to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by the Defendants misrepresented the type and nature of DME provided to insureds and fraudulently inflated the charges to GEICO. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in

part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

248. Niyazov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

249. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $596,000.00 pursuant to the fraudulent bills submitted through Rehab Essentials.

250. By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs, GEICO, demand that a Judgment be entered in their favor:

A. On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that CSO Supply has no right to receive payment for any pending bills for the Fraudulent Equipment submitted to GEICO, amounting to more than $1,900,000.00;

B. On the Second Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $453,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

C. On the Third Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $453,000.00, together with

punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

D. On the Fourth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $453,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and further relief as the Court deems just and proper.

E. On the Fifth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $453,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and further relief as the Court deems just and proper.

F. On the Sixth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $596,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

G. On the Seventh Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $596,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

H. On the Eighth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $596,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and further relief as the Court deems just and proper.

I. On the Ninth Cause of Action against the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $596,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and further relief as the Court deems just and proper.

Dated: October 29, 2026
Uniondale, New York

RIVKIN RADLER LLP

By: /s/ *Michael Sirignano*

Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joshua D. Smith, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*